UNITED STATES DISTRICT COURT

DISTRICT OF MONTANA

BILLINGS DIVISION

| | |
|---|---|
| ARLENE HULL, by and through her Daughter, Next of Friend and Power of Attorney, DIANA HULL SENNE,<br><br>   Plaintiff,<br><br>vs.<br><br>ABILITY INSURANCE COMPANY, f/k/a MEDICO LIFE INSURANCE COMPANY, ABILITY RESOURCES, INC., ABILITY REINSURANCE HOLDINGS LIMITED, a Bermuda Limited Company, and ABILITY REINSURANCE LIMITED, a Bermuda Limited Company,<br><br>   Defendants. | Cause No.  CV-10-116-BLG-RFC<br><br><br>**ORDER REDUCING PUNITIVE DAMAGES UNDER MCA 27-1-221** |

**INTRODUCTION**

On April 6, 2012, the jury returned compensatory and punitive damage

verdicts against Defendants. *See Docs. 185 and 186.* The jury awarded damages

for breach of the insurance contract in the amount of $250,000. *Doc. 185.* The

jury found that Defendants had no reasonable basis in fact or law for denying

Arlene Hull's claim, and that Defendants violated the Montana Unfair Trade

Practices Act and awarded Plaintiff damages in the amount of $2,000,000. *Doc.*

*185.* Finally, the jury found that punitive damages should be assessed against Defendants. *Doc. 185.* In the second phase, the jury returned a verdict imposing punitive damages against Defendants in the amount of $32,000,000. *Doc. 186.*

## STANDARD OF REVIEW

Pursuant to Mont. Code Ann. §27-1-221(7)(c), this Court must review the jury's award of punitive damages considering the factors set forth in Mont. Code Ann. §27-1-221(7)(b). Upon review, the Court may increase, decrease, or affirm the punitive damages award and must make findings of fact and conclusions of law stating the reasons for either affirming, decreasing, or increasing the jury award. Mont. Code Ann. § 27-1-221(7)(c); *Seltzer v. Morton,* 2007 MT 62, ¶ 165, 336 Mont. 225, 154 P.3d 561; and *Marie Deonier & Assoc. v. Paul Revere Life Ins. Co.,* 2004 MT 297, ¶ 42, 323 Mont. 387, 101 P.3d 742 *(Deonier II).* The Court has broad discretion in deciding whether to increase, decrease, or affirm the jury's punitive damage verdict. *Cartwright v. Equitable Life Assurance Society,* 276 Mont. 1, 37, 914 P.2d 976, 997 (Mont. 1996).

Subparagraph (5) of Mont. Code Ann. § 27-1-221, provides that all elements of a claim for punitive damages must be proven by clear and convincing evidence and defines clear and convincing evidence as "more than a preponderance of evidence but less than beyond a reasonable doubt."

## ANALYSIS

Throughout this trial, the Court paid careful attention to the testimony of witnesses and the exhibits upon which the parties relied. The Court had the opportunity to observe the witnesses on direct and cross-examination, and paid careful attention to the demeanor of each witness, as well as their reactions to the questions of counsel and the exhibits used in evidence. The findings below are based in part on that assessment of each witness's credibility, along with the substance of the testimony and the exhibits that make up the record.

The Court determines that the facts, as set forth below, were established by substantial, clear and convincing evidence. That is, evidence a properly instructed jury could find to be more than a preponderance of the proof submitted, and as to which there was no serious or substantial doubt about the correctness of the conclusions to be drawn therefrom. *See* Mont. Code Ann. § 27-1-221(5).

Consistent with the determinations implicit in the jury's verdict, the Court makes the following review of the nine criteria set forth in Mont. Code Ann. § 27-1-221(7)(b)(i) - (ix). The Court will address the nine factors out of order.

**1.      Any Other Circumstances that may Operate to Increase or Reduce, Without Wholly Defeating, Punitive Damages- § 27-1-221(7)(b)(ix)**

The final factor listed under § 27-1-221(7)(b) for the Court's consideration is "any other circumstances that may operate to increase or reduce, without wholly defeating punitive damages."   The Court will consider this factor first as it is highly pertinent given Montana's statutory authority.

The Court must give mandatory consideration to the statutory language of Mont. Code Ann § 27-1-220(3):

> An award for punitive damages may not exceed $10 million or 3% of a defendant's net worth, whichever is less. This subsection does not limit punitive damages that may be awarded in class action lawsuits.

"Statutory interpretation, the goal of which is to give effect to the legislature's intent, begins with the text of the statute." *Giacomelli v. Scottsdale Ins. Co.*, 354 Mont. 15, 19, 221 P.3d 666, 669 (2009).  The role of the Court in interpreting statutory language is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.  *Stenstrom v. State,* 280 Mont. 321, 327, 930 P.2d 650, 654 (1996).

The plain text of the statute imposes the $10 million cap on the total award, not on each defendant. Unfortunately, Montana courts have not spoken on this issue and the legislative history of this statute does little to clarify the matter.

The verdict form in this case made only one punitive damages award and specifically states: "We the jury, being duly empaneled and sworn upon oath, and all of us agreed upon a verdict, assess punitive damages in the amount of: $32,000,000." *See Doc. 186*. That singular amount was awarded against all Defendants jointly and the jury did not make separate awards against the Defendants, nor did it apportion its singular award between Defendants in any fashion. *Id*.

Furthermore, Plaintiff has asserted a theory throughout this case that Defendants acted as one entity and each Defendant was the alter ego of the others. That theory was prevalent in filings and closing arguments at trial. "When Ability seeks to acquire new blocks of business, it presents itself not as four separate companies, but as one big one." (Pl.'s Resp. to Def.'s Br. in Support of Rule 56(c) Motion for Summary Judgment, *Doc. 123*; Pl's Amend. Compl. ¶¶ 45-48; Tr. at 103, 108, 772-82, 790).

Plaintiff is estopped from now switching theories to apply the punitive damages cap on an individual defendant basis. There is persuasive authority to

support the determination that courts do not tolerate attempts to have it both ways

on the issue of alter-ego. *Cf. Knickman v. Midland Risk Services – Illinois, Inc.*,

700 N.E.2d 458, 462 (Ill. App. Ct. 1998) ("Permitting plaintiff to deem MFG the

alter ego of Midland Illinois to recover against MFG for breach of the contract but

to treat MFG as a separate entity so as to recover for tortious interference with the

employment contract and to recover punitive damages would appear to be

unfair. . . once plaintiff interjected the theory into the case, he had to live with the

consequences."); *Beck v. Flint Constr. Co.*, 268 S.E.2d 739, 741 (1980) ("We

conclude that Beck cannot successfully combine Flint as the alter ego of Latex and

at the same time argue that they are separate for purposes of avoiding the exclusion

established by Code Ann. § 114-103."). Punitive damages assessed in this case

must be assessed against all Defendants jointly.

Additionally, Plaintiff's theory that the $10 million maximum applies per

Defendant would lend itself to the idea that plaintiffs in civil cases seeking punitive

damages could potentially benefit by adding defendants in the hopes that they

could seek $10 million in punitive damages against each defendant. This is

certainly not how the legislature intended Mont. Code Ann § 27-1-220(3) to be

applied. This could cause the unnecessary addition of defendants to cases in the

hopes of a higher punitive damage verdict.

Therefore, based upon the statutory limitation of Mont. Code Ann § 27-1-220(3), the punitive damages may not exceed $10,000,000 and the punitive damage verdict in this case is reduced to said amount.

### 2. Nature and Reprehensibility of Defendants' Conduct - § 27-1-221(7)(b)(i)

The first factor under § 27-1-221(7)(b) is the "nature and reprehensibility of the defendant's wrongdoing." According to the United States Supreme Court, "[t]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Campbell,* 538 U.S. at 418.

Defendant's wrongful termination of long term care insurance in an effort to save money is highly reprehensible. The evidence at trial demonstrated Defendants were aware that Mrs. Hull needed daily assistance with meal preparation, medications, maintaining her personal hygiene and generally all of the activities of independent living. TT 422-431; 541-542; Exhibit 37. Mrs. Hull was unable to cook, shop for her own food, or administer her own medicines without supervision, because of her cognitive state. TT 422-431, Exhibit 37.

Prior to the wrongful termination of benefits, Defendants sought no information from her treating physician Dr. Ulrich, sent him no APS forms, and

ordered none of Dr. Ulrich's medical records of Mrs. Hull. TT 285, 286, 545.

This was not an oversight. It was intentional. Thais VanDyke testified she has

never contacted a treating physician because that is the way she was taught to do it.

TT 558.

After Mrs. Hull's improper termination of benefits, Defendants received

substantial information which should have caused them to reinstate Mrs. Hull's

benefits and pay for past benefits. However, this new information had no affect on

their termination of her benefits, which further solidifies the reprehensibility of

their conduct. TT 314-318, Exhibit 235.

The fact that Mrs. Hull avoided direct physical injury cannot be credited to

Defendant. She was in a particularly vulnerable state and needed care from others

to protect her health and safety. TT 422-431, Exhibit 37. Mrs. Hull was unable to

return to her home and live alone. TT 422-431, Exhibit 37. Fortunately, after

termination of benefits, Mrs. Hull's family undertook the financial responsibility to

ensure she was able to maintain her residence at St. John's. TT 452-454.

The termination of benefits evinced an indifference to the health and safety

of Mrs. Hull and other policyholders who were potentially treated in the same

manner due to the undisputable fact that the elderly are particularly vulnerable. Dr.

Ulrich confirmed that elderly people like Mrs. Hull who suffer from dementia will

regress slower if they are being properly cared for in an assisted living facility. TT 398-399. Accordingly, the Court finds that imposing significant stress and fear on such a person will likely exacerbate and further accelerate her decline. Wrongful termination of benefits would undoubtedly cause financial, emotional and physical damages to any policyholder.

The Court agrees with the jury's finding regarding the high degree of reprehensibility of Defendants' conduct. Defendants' conduct warrants punitive sanction.

### 3.   Extent of the Defendants' Wrongdoing - § 27-1-221(7)(b)(ii)

The second factor under § 27-1-221(7)(b) is the "extent of the defendant's wrongdoing."

As stated in the Court's analysis of reprehensibility, in an attempt to save money by limiting the amount of benefits being paid to policyholders, Defendants improperly terminated Mrs. Hull's claim for long term care benefits by interpreting her policy wrongfully.

The wrongful termination of benefits occurred for a period of sixteen months, from February 1, 2010 until October 6, 2011, when her coverage was reinstated. Exhibit 75; TT 316-317, Exhibit 235. Fortunately for Mrs. Hull, her family did not move her from her familiar environment at St. John's and they were

able to continue paying for her long term care.  TT 452-454.  However, even

during the period of time when the benefits were terminated, Mrs. Hull was aware

that there was financial strain, which caused her to suffere emotional distress.  TT

452-454.

### 4.	Intent of the Defendants in committing the wrong - § 27-1-221(7)(b)(iii)

The third factor under § 27-1-221(7)(b) is the "intent of the defendant in

committing the wrong."

Defendants' intent is clear: to reduce claim payments and increase profit for

the company.  The LifePlan audit conducted estimated that application of "more

robust" claim practices would generate savings.  TT 269-270.  The LifePlan report

also recommended that claims handlers avoid relying on information from treating

physicians.  TT 626, 272, Ex. 44.  The Lifeplan report stated that the long term

care policy's cognitive impairment eligibility language "is unclear and subject to

much interpretation."  TT 293-294, 651-654.  The LifePlan report advised that

implementation of LifePlan procedures would result in minimum savings of 15%

on new claims and 3% of claims previously accepted.  Ex. 44, p. 4.  With 60,000

policyholders and 2000 new claims each year, this could result in a significant

savings.  TT 295-96.

Ability's Senior Vice-President Lawler testified, "we tried to implement as many [of the LifePlan protocols] as we could." TT 296. Included in those implemented protocols was a revision of the definition of "continual supervision"[1] to mean "that the insured requires and is provided continuous (round-the-clock) supervision from another person" to qualify for benefits. Ex. 60. By modifying the definition of "continual supervision," per the recommendation of the LifePlan report, it was increasingly more difficult for policyholders, such as Mrs. Hull, to qualify for benefits.

Defendants' wrongful and invalid termination of Mrs. Hull's benefits to protect their profits by using "more robust" claims handling practices establishes intent that is consistent with the purpose of punitive damages.

### 5. Profitability of the Defendants' Wrongdoing - § 27-1-221(7)(b)(iv)

The fourth factor under § 27-1-221(7)(b) is the "profitability of the defendant's wrongdoing."

---

[1] To be eligible for benefits under the cognitive impairment provision, the policy requires, *inter alia*, that the policyholder be certified by a licensed health care practitioner as "[r]equiring substantial supervision to protect such persons from threats to health and safety due to severe cognitive impairment." Ex. 12, pp. 6-7. The term "severe cognitive impairment" is defined as "[d]eterioration of or loss in your intellectual capacity due to organic brain disease or disorder, which requires **continual supervision** to protect yourself or others. . ." (emphasis added) *Id.* at p. 6.

Defendants profited from their wrongful termination of benefits. However, the extent that Defendants profited is unclear, especially since the Court has been unable to make a determination of Defendants' true financial condition. However, proof at trial demonstrated that the profitability to Defendants was at least $29,424, which was the amount of unpaid benefits during the sixteen months when Mrs. Hull's claims were decertified. *See* Tr. 790:14-16.

### 6. Amount of Actual Damages Awarded by the Jury - § 27-1-221(7)(b)(v)

The fifth factor under § 27-1-221(7)(b) is the "amount of actual damages awarded by the jury."

The jury awarded Mrs. Hull $2,250,000 in actual damages. The United States Supreme Court has instructed courts reviewing punitive damages for purposes of due process to consider, among other factors, "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *State Farm Mutual Auto Ins. Co. v. Campbell,* 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

In doing so, the Supreme Court has consistently refused "to impose a bright-line ratio which a punitive damages award cannot exceed." *Campbell*, 538 U.S., at 425. The Court stated, "Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id*.

Applying *BMW of North America v. Gore*, 517 U.S. 599 (1996)*,* the Montana Supreme Court has similarly recognized that no "particular mathematical formula or ratio of compensatory to punitive damages" governs the constitutionality of a punitive damages award. *Deonier II ¶ 65* (rejecting trial court's "application of a 5:1 ratio of punitive damages to compensatory damages as a determination of the constitutionality of the jury's award," and reversing reduction of punitive damages award).

The jury award of $2,250,000 in actual damages and $32,000,000 in punitive damages computes to a ratio of more than 14 to 1. The reduced punitive damage award computes to a ratio of a little more than 4:1, which is far more

reasonable and significantly reduces the disparity between the actual or potential

harm suffered by the Plaintiff and the punitive damages award.

**7.    Defendants' Net Worth - § 27-1-221-(7)(b)(vi)**

The sixth factor under § 27-1-221(7)(b) is the "defendant's net worth."

Defendants had the burden of producing competent and reliable evidence at

trial for that purpose. *Blue Ridge Homes, Inc. v. Thien*, 2008 MT 264, ¶ 68, 191

P.3d 374; *Cartwright v. Equitable Life Assurance Society*, 276 Mont. 1, 37, 914

P.2d 976, 999 (Mont. 1996).

In *Maurer v. Clausen Distr. Co.*, 275 Mont. 229, 912 P.2d 195 (1996), the

Montana Supreme Court reversed a trial court's order for a new trial on the issue of

punitive damages, after the trial court concluded that an absence of net worth

evidence required it to order a new trial.  The Montana Supreme Court stated:

> In *Gurnsey v. Conklin Co., Inc.* (1988), 230 Mont. 42, 55,
> 751 P.2d 151, 158, we stated a plaintiff is not required to
> show proof that a defendant's net worth supports an award of
> punitive damages.  If the defendant's net worth does not
> support an award of punitive damages, the defendant must
> produce evidence to that fact. *Gurnsey*, 751 P.2d at 158.
> Tucker should not gain an advantage from failing to produce
> evidence of his net worth.  Accordingly, there was no
> evidence that Tucker's net worth could not support a punitive

-14-

> damage award of $75,000, and so, the District Court erred in
> vacating the jury's award of punitive damages against
> Tucker.

*Maurer v. Clausen Distr. Co.,* 275 Mont. at 235-236.

Defendants have never been forthright about their net worth. Now that trial is over, Defendants have offered an affidavit from Michael Crow, President and CEO for Ability Reinsurance Holdings Limited and President and CEO of Ability Reinsurance (Bermuda) Limited; affidavit of Paul Collins; Ron Herman letter; case management surveys; organizational chart; and consolidated financial statements. *See Docs 213 & 214.* Defendants have informed the Court that the consolidated net worth of all Defendants as of December 31, 2011 was $40.7 million.

The Court notes that the affidavit of Michael Crow states that Ernest and Young audits the financial condition of Ability Reinsurance Holdings Limited every year. *Doc. 214.* That means that before trial and at the time of trial, Defendant had audited financial statements in their possession that they did not produce. Furthermore, Michael Crow, or any other corporate representative who has knowledge of Defendants' financial condition, certainly could have testified at trial.

As an additional complication, the majority of Defendants' assets are moved out of the United States for tax, investment and regulatory reasons. As a result, the true nature and extent of Defendants' net worth is unknown.

For the Court to consider these late exhibits would be unjust. Plaintiff did not have an opportunity to cross examine Michael Crow or the person who generated the consolidated financial statements. The purpose of trial is to test the credibility and trustworthiness of evidence and Defendants must not be allowed to circumvent this process.

**8.      Previous Awards of Punitive or Exemplary Damages Against Defendants Based on the Same Wrongful Act - § 27-1-221(7)(b)(vii)**

The seventh factor under § 27-1-221(7)(b) is the "previous awards of punitive or exemplary damages against defendants based on the same wrongful act."

There is no evidence of a prior punitive damage award against Defendants based on the wrongful conduct at issue here. Thus, there is no indication that

upholding the punitive damage award will result in it being punished more than

once for the same conduct. *Cartwright,* 914 P.2d at 1001. Moreover, the jury was

instructed that it was not to impose punitive damages based on harm that any

conduct of Defendants may have caused to persons other than Mrs. Hull. *Doc.*

*183, Instruction B. See Philip Morris v. Williams,* 549 U.S. 346, 127 S.Ct. 1057,

1061 (2007).

> **9.** **Potential or Prior Criminal Sanctions Against the Defendants Based Upon the Same Wrongful act- § 27-1-221(7)(b)(viii)**

The eighth factor under Mont. Code Ann. § 27-1-221(7)(b) is the "potential

or prior criminal sanctions against the defendants based upon the same wrongful

act."

No evidence has been presented to suggest that Defendants have been, or are

at risk of being subjected to double punishment by virtue of any criminal sanction

applicable to the harm caused to Mrs. Hull. Since no criminal sanctions have been

imposed against Defendants as a result of their conduct with respect to Mrs. Hull,

this weighs in favor of a substantial punitive damage award.

Based on the review of these nine factors set forth in Mont. Code Ann. § 27-1-221(7) (b), and § 27-1-220, the jury's punitive damage assessment against Defendants is limited to $10,000,000.

### 10.    Review Under Federal Due Process Guideposts

The U.S. Constitution gives to the states' broad discretion, subject to federal due process limitations, to determine the level of punitive damages necessary to further the state interests of punishing and deterring conduct.  *BMW*, 517 U.S. at 568, 116 S.Ct. at 1595.  The Fourteenth Amendment's Due Process Clause prohibits States from imposing punitive damages that are arbitrary or grossly excessive in relation to these state interests.  *Campbell*, 538 U.S. at 416, 123 S.Ct. at 1519-20; *BMW*, 517 U.S. at 568, 116 S.Ct. at 1595; *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 453-54, 113 S.Ct. 2711, 2718 (1993).

Courts must review punitive damage awards for compliance with substantive and procedural federal due process standards by considering three guideposts:  (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the punitive damages award and the harm or potential harm suffered by the plaintiff; and (3) the difference between the punitive damage award

and civil penalties authorized or imposed in comparable cases. *Campbell*, 538 U.S. at 418, 123 S.Ct. at 1520; *BMW*, 517 U.S. at 574-75, 116 S.Ct. at 1598-99.

### A.     Guidepost 1 - Degree of Reprehensibility

The degree of reprehensibility of the defendant's conduct is the most important indication of the reasonableness of a punitive damage award. *Campbell*, 538 U.S. at 419, 123 S.Ct. at 1521; *BMW,* 517 U.S. at 575, 116 S.Ct. at 1599. "This principle reflects the accepted view that some wrongs are more blameworthy than others." *BMW*, 517 U.S. at 575, 116 S.Ct. at 1599. The relevant considerations include but are not limited to: (1) whether Defendants' conduct causes physical as opposed to economic harm; (2) whether the conduct evinces an indifference to the health or safety of others; (3) the vulnerability of the victim; (4) whether the conduct involves repeated actions or was an isolated incident; (5) whether the harm was the result of intentional malice, trickery or deceit, or mere accident. *Seltzer ¶ 167*; *Campbell*, 538 U.S. at 419, 123 S.Ct. at 1521; *BMW*, 517 U.S. at 576-79, 116 S.Ct. at 1599-1601.

The Court must presume that the compensatory award compensates the plaintiff for the injury caused by the defendant's tortious conduct. *Campbell*, 538 U.S. at 419, 123 S.Ct. at 1521.

Pursuant to the first *BMW* due process guideline in this case, the Court hereby incorporates and adopts by reference its above-referenced analysis of the Montana statutory reprehensibility factor pursuant to Mont. Code Ann. § 27-1-221(7)(b)(I).

Defendants' conduct caused physical, emotional, and economic harm. Defendants' conduct evinced an indifference to the health or safety of others. Defendants knew that terminating benefits could result in the termination of needed care, and without such care the health and safety of Mrs. Hull would be at risk, particularly because the elderly are inherently vulnerable.

As independently determined by the Court in the foregoing statutory analysis, the Court agrees with the jury's finding regarding the high degree of reprehensibility of Defendants' conduct. Defendants' conduct warrants punitive sanction.

## B. Guidepost 2 - Disparity between Punitive Damages Award and Actual/Potential Harm

A punitive damages award that is not reasonably proportional between the harm or potential harm resulting from the tortious conduct is constitutionally unreasonable or excessive. *Campbell*, 538 U.S. at 426, 123 S.Ct. at 1524; *BMW*,

517 U.S. at 580-81, 116 S.Ct. at 1601-02; *TXO*, 509 U.S. at 453-54, 113 S.Ct. at 2718.

The ratio of punitive damages to compensatory damages must be reasonably proportionate by constitutional standards. *BMW*, 517 U.S. at 580, 116 S.Ct. at 1601. However, there is no rigid "concrete" limit, "bright-line ratio," or "simple mathematical formula" for determining what ratio is constitutionally reasonable in a particular case. *Campbell*, 538 U.S. at 424-25, 123 S.Ct. at 1524; *BMW*, 517 U.S. at 582-83, 116 S.Ct. at 1602. Thus, "[i]n most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis," except when the ratio is "breathtakingly" disproportional. *BMW*, 517 U.S. at 583, 116 S.Ct. at 1603.

A number of other courts, including the Montana Supreme Court, have since found punitive damage awards with single-digit ratios greater than 4 to 1 to be constitutionally permissible. *See, e.g., Seltzer* ¶199 (determining 7.1 to 1 ratio in penalty award "adequately serves Montana's interest in punishment and deterrence, thereby protecting its citizens and preserving the integrity of the judicial system, while comporting with the constraints of due process") and *Deonier II* ¶67 (reinstating 7 to 1 ratio after district court reduction to 5 to 1).

Mrs. Hull's compensatory damages are $2,250,000 and punitive damages are $10,000,000, after being reduced by the Court, pursuant to Mont. Code Ann. § 27-1-221(7)(b)(ix). This computes to a ratio of a little more than 4 to 1. This single digit ratio is constitutional and is not excessive, especially since Defendants' conduct is particularly reprehensible. This ratio is well within the 9 to 1 ratio the U.S. Supreme Court characterized in *Campbell* as the outer due process limit for most punitive damage awards.

### C. Guidepost 3 - Disparity between Punitive Damage Award and Civil Penalties for Comparable Conduct

The third due process guidepost is the disparity between a punitive damage award and civil penalties for comparable conduct. *BMW*, 517 U.S. at 583, 116 S.Ct. at 1603; *Campbell*, 538 U.S. at 428, 123 S.Ct. at 1526. Implicit in this guidepost is the principle that a court reviewing a punitive damage award for due process compliance" should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *BMW*, 517 U.S. at 583, 116 S.Ct. at 1603. This guidepost may also include consideration of the level of punitive damages awarded in this state or elsewhere to punish comparable conduct. *BMW*, 517 U.S. at 584, 116 S.Ct. at 1603.

The conduct committed by Defendants could subject them to revocation of the right to engage in the business of insurance, a penalty that would cost them more than the punitive damages awarded in this case. Thus, the punitive damages award is constitutionally reasonable under the third *BMW* guidepost.

## CONCLUSION

Pursuant to Mont. Code Ann. §§ 27-1-221(7) (c), 27-1-221(7) (b), 27-1-220(3), and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, the Court hereby reduces the jury's punitive damages award to $10,000,000 against Defendants. Further, Defendants must pay Mrs. Hull $250,000 in breach of contract damages and $2,000,000 for violations of the Montana Unfair Trade Practices Act.

THEREFORE, IT IS HEREBY ORDERED that judgment upon the jury verdicts for compensatory damages in the amount of $2,250,000 and punitive damages in the amount of $10,000,000, be entered by the Clerk of Court forthwith, with interest bearing upon the judgment at the legal rate from and after April 6, 2012, to the date upon which Plaintiff is fully paid by Defendants.

*///*

*SO ORDERED* this 6th Day of December, 2012.

                                        */s/ Richard F. Cebull*_____
                                        Richard F. Cebull
                                        U.S. District Judge